# United States Court of Appeals
# for the Fifth Circuit

United States Courts
Southern District of Texas
FILED

OCT 3 0 2024

Nathan Ochsner, Clerk of Court

No. 23-40564

United States Court of Appeals
Fifth Circuit

**FILED**

October 8, 2024

Lyle W. Cayce
Clerk

ARMANDO IBANEZ,

*Plaintiff—Appellant,*

*versus*

TEXAS A&M UNIVERSITY KINGSVILLE,

*Defendant—Appellee.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:21-CV-249

---

Before KING, STEWART, and HIGGINSON, *Circuit Judges.*

KING, *Circuit Judge*:

After being denied tenure and a promotion to associate professor, Armando P. Ibanez, a Mexican-American male, sued his former employer, Texas A&M University–Kingsville, alleging employment discrimination on the basis of race and national origin under Title VII of the Civil Rights Act of 1964. The district court granted Texas A&M's motion for summary judgment and dismissed Ibanez's claims. We AFFIRM.

No. 23-40564

## I.

### A.

Plaintiff-Appellant Armando P. Ibanez is a Mexican-American male who was employed by Defendant-Appellee Texas A&M University-Kingsville ("TAMUK"). TAMUK hired Ibanez in the fall of 2014 to serve as an Assistant Professor of Communications/Radio-Television-Film—a tenure-track position. Ibanez's position was in TAMUK's Department of Art, Communications, and Theatre, part of the Humanities Division within the College of Arts and Sciences.

Under TAMUK rules, as a tenure-track professor, Ibanez "had five years to prepare to apply for tenure and promotion to associate professor." At the end of those five years, Ibanez would be "simultaneously evaluated for both tenure and promotion to associate professor."[1] To qualify for tenure and promotion, Ibanez was required to meet certain "minimum requirements" set by TAMUK. One of those "minimum requirements" was the creation or completion of "a minimum of two . . . refereed publications or juried creative activities." TAMUK permitted "[n]o substitutions, other than patents" for this requirement.

Additionally, meeting the minimum requirements for scholarly activity did not guarantee promotion or tenure, and an individual college's written guidelines could exceed university minimums. As such, the Department of Art, Communications, and Theatre "also required a minimum of two scholarly or creative works in a secondary category of scholarship."

---

[1] The criteria for tenure and promotion to associate professor were identical.

2

No. 23-40564

During Ibanez's employment with TAMUK, Ibanez produced an extensive number of productions, performances, and other creative works. These included, *inter alia*, five short films, such as *South Texas Gentle Men of Steel—Los Padres* ("*Men of Steel*"), seven poems, six narrative and documentary films, and two screenplays. In addition, Ibanez acted as Festival Director for the Blazing Sun Independent Film Shorts Festival and served as the faculty advisor for the TAMUK Film Society. Critically, however, the only work that Ibanez labels as "juried" in the summary judgment record is *Men of Steel*.

Ibanez submitted his application for tenure and promotion in December 2019. Applications for tenure and promotion to associate professor—including Ibanez's application—were evaluated through the following multi-level process:

1. First, a committee comprised of the applicant's tenured department faculty reviews the applicant's submitted portfolio and issues a recommendation.

2. Second, the department chair reviews the portfolio and issues a recommendation.

3. Third, a committee comprised of tenured faculty from each department within the applicant's college reviews the portfolio and issues a recommendation.

4. Fourth, the dean of the applicant's college reviews the portfolio and issues a recommendation.

5. Fifth, the provost reviews the portfolio and issues a recommendation.

6. If the provost issues a negative recommendation, the applicant can appeal. If the applicant appeals, an advisory committee first performs an initial review of the applicant's arguments and decides whether full consideration of the merits is warranted. The advisory committee does not determine the merits of the appeal, nor does it issue any

No. 23-40564

recommendation regarding whether the applicant should be tenured and promoted.

7. If the advisory committee agrees that the applicant's appeal should proceed, the appeal is split into two parts: a promotion appeals committee considers whether the applicant should be promoted, and a tenure appeals committee separately considers whether the applicant should be tenured.

8. Finally, after each level of review is complete, and all appeals have been exhausted, the university president reviews the portfolio and provides a final decision on whether to recommend the applicant for tenure and promotion.

Starting at the first level, Ibanez's departmental committee voted in favor of recommending him for tenure and promotion. However, at the second through fifth levels of review, the department chair, the college committee, the college dean, and the provost voted against recommending Ibanez for tenure and promotion. The department chair, college dean, and provost all noted that they based their negative recommendations on the fact that Ibanez failed to "meet the minimum requirements for scholarly or creative works" because "he had completed only one juried film during his five years as an assistant professor at TAMUK." In addition, the college dean and provost pointed to Ibanez having proffered only a single work, out of a necessary two, that fell within the Department of Art, Communications, and Theatre's second required category.

Because the provost issued Ibanez a negative recommendation, Ibanez appealed the decision to an advisory committee. The advisory committee, in a 3-to-2 vote, concluded that Ibanez "established a *prima facie* case that the [provost's] decision was made in violation of the faculty member's academic freedom, for an illegal reason, or without adequate consideration of the

4

No. 23-40564

faculty member's record of professional achievement."[2] Accordingly, Ibanez's portfolio was sent for review to both a promotion appeals committee and a tenure appeals committee.

The two appeals committees split in their decisions: while the promotion appeals committee voted against Ibanez, the tenure appeals committee, in a 4-to-3 decision, voted in favor of Ibanez. A majority of the tenure appeals committee found that Ibanez "met university, college, and departmental expectations in teaching, scholarly activity, professional growth, and service," that Ibanez's department "lacks formal guidelines for evaluating scholarly work in the area of film production," and that Ibanez "is an asset to the university and has earned tenure and promotion."[3]

After Ibanez's appeals concluded, the university president conducted his review of Ibanez's portfolio, Ibanez's annual evaluations, and the decisions from the preceding levels of review. He testified that he declined to recommend Ibanez for tenure and promotion "[d]ue to Professor Ibanez'[s] lack of scholarship, and in light of the negative recommendations of the department chair, college committee, college dean, provost, and promotion

_____

[2] The record does not contain the exact allegation(s) that Ibanez made against the provost's decision. However, in an email sent to the dean prior to the dean's (and the provost's) review, Ibanez explained that the department chair and the college committee incorrectly voted against his promotion and tenure because his "important accomplishments" were improperly accounted for. One of the reasons Ibanez proffered for this outcome was that "there [was] no criteria to evaluate work in filmmaking . . . at the university." Ibanez requested that "another party, knowledgeable in evaluating filmmaking professors" evaluate his work and referred the dean to the criteria adopted by the University Film and Video Association.

[3] Also of note is that TAMUK's Student Government Association supported Ibanez's promotion and tenure and signed a Senate Resolution in "Recognition & Support [of Ibanez]" on November 18, 2020. The Hispanic Faculty Council similarly expressed support for Ibanez.

No. 23-40564

appeals committee in his case." As a result, Ibanez was denied tenure and promotion.

## B.

On October 27, 2021, Ibanez sued TAMUK, alleging that the university unlawfully denied him tenure and promotion based on his race and national origin in violation of Title VII of the Civil Rights Act of 1964.[4] On June 6, 2023, TAMUK moved for summary judgment, and Ibanez opposed the motion on June 13, 2023.

In support of his opposition, Ibanez submitted a sworn declaration and report from an expert witness, Dr. Laura Vazquez. Dr. Vazquez reviewed Ibanez's tenure and promotion case, and prepared "an opinion as an expert in the field of evaluating the work of academic filmmakers." In her report, Dr. Vazquez supported Ibanez's qualification for tenure, explaining that many of his creative endeavors "received no credit in the tenure review process," and that he "was clearly judged by an inappropriate and thus unfair standard that led to his loss of tenure and promotion." When evaluated under alternative "national and international standards of academic filmmakers," Ibanez's achievements were "more than satisfactory."

Ibanez also submitted a sworn declaration from another (now retired) TAMUK professor, Santa C. Barraza. Barraza served as a professor in the Department of Art, Communications, and Theatre, and she taught at TAMUK for twenty-three years. In her declaration, Barraza stated that she had "personal knowledge" of three "Euro-American" individuals who were treated differently than Ibanez during the review of their tenure applications:

---

[4] Ibanez also originally brought a claim under 42 U.S.C. § 1981. In a decision that Ibanez does not appeal, the district court dismissed that claim for lack of jurisdiction under the Eleventh Amendment.

No. 23-40564

Patrick Faherty, Corey Wayne Ranson, and Todd Lucas. Barraza explained that for Faherty, TAMUK waived certain ordinary requirements for tenure "in lieu of other scholarly substitutes identified in [an] alternative plan," and that for Ranson, TAMUK made an exception "to accommodate his tenure process when he did not yet hold the required terminal degree of Master of Fine Arts." Barraza also noted that Lucas—a graphic design professor—was promoted and given tenure even though Barraza, while acting as the Chair of the Art Department, voted against his promotion because of his "limited scholarship activities and accomplishments." In sum, Barraza declared that "TAMUK did not require the same academic standards of all candidates for tenure and promotion," and that Ibanez "was not treated equally by the Departmental Chair and the Dean of College of Arts & Sciences as compared to Euro-Americans in the department who obtained tenure and promotion."

On August 29, 2023, the district court granted summary judgment in favor of TAMUK and dismissed Ibanez's discrimination claims. Ibanez timely appealed.

## II.

This court reviews grants of summary judgment de novo. *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 502 (5th Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute as to a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). In reviewing the record, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

No. 23-40564

However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 399 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Instead, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little*, 37 F.3d at 1075. This court may grant summary judgment when "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993).

Finally, "[i]t is well settled in this Circuit that the scope of appellate review on a summary judgment order is limited to matters presented to the district court." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339 (5th Cir. 2005). "If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." *Id.* at 339–40 (quoting *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002)). "However, an argument is not waived on appeal if the argument on the issue before the district court was sufficient to permit the district court to rule on it." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 428 n.29 (5th Cir. 2002).

## III.

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff may prove a case under Title VII using either direct evidence or circumstantial evidence. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Absent direct evidence of discrimination, this

No. 23-40564

court applies the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under this framework, the plaintiff bears the initial burden to establish a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If successful, "the burden of production shifts to [the defendant] to proffer a legitimate, nondiscriminatory reason for [its] action." *Id.* If the defendant meets that burden, "the presumption of discrimination disappears," and the plaintiff must produce substantial evidence indicating that the defendant's proffered reason is pretext for discrimination. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); *see also Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016).

"Tenure falls within the ambit of employment decisions covered by Title VII." *Chu v. Miss. State Univ.*, 592 F. App'x 260, 263 (5th Cir. 2014) (citing *Tanik v. S. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997)). "To establish a prima facie case in the context of a denial of tenure, the plaintiff must show that: (1) he belongs to a protected group, (2) he was qualified for tenure, and (3) he was denied tenure in circumstances permitting an [inference] of discrimination." *Tanik*, 116 F.3d at 775–76. Evidence that supports a prima facie case includes "departures from procedural regularity, conventional evidence of bias on the part of individuals involved, or that the plaintiff is found to be qualified for tenure by some significant portion of the departmental faculty, referrants or other scholars in the particular field." *Id.* (internal quotation omitted).

This court has noted that "[u]niversity tenure decisions represent a distinct kind of employment action, involving special considerations." *Chu*, 592 F. App'x at 265. For example, "tenure contracts require unusual commitments as to time and collegial relationships, academic tenure decisions are often non-competitive, tenure decisions are usually highly

9

No. 23-40564

decentralized, the number of factors considered in tenure decisions is quite extensive, and tenure decisions are a source of unusually great disagreement." *Tanik*, 116 F.3d at 776 (numbering omitted). As such, courts have held that tenure decisions "are generally entitled to more deference than employment decisions in other settings." *Thrash v. Miami Univ.*, 549 F. App'x 511, 521 (6th Cir. 2014); *see also Kumar v. Bd. of Trs., Univ. of Mass.*, 774 F.2d 1, 12 (1st Cir. 1985) (Campbell, C.J., concurring); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007); *Kobrin v. Univ. of Minn.*, 121 F.3d 408, 414 (8th Cir. 1997).

Ibanez has not presented direct evidence of discrimination, so we apply the *McDonnell Douglas* burden-shifting framework. The parties agree that Ibanez is a member of a protected group. Thus, the remaining elements of a prima facie case in dispute are whether Ibanez was: (1) qualified for tenure, and (2) denied tenure under circumstances permitting an inference of discrimination. *See Tanik*, 116 F.3d at 775–76.

## A.

We begin by assessing whether Ibanez has established that he was qualified for tenure. To determine whether a plaintiff is "qualified for tenure," courts examine a university's "established . . . tenure requirement[s]." *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 257 (5th Cir. 1999); *see also Chu*, 592 F. App'x at 265. Here, a baseline requirement for tenure at TAMUK was the completion of "a minimum of two . . . juried creative activities." Because Ibanez failed to show a genuine dispute of material fact as to whether he met this prerequisite, his prima facie case fails.

While neither party explicitly defined "juried" in the record, both use the term to refer to a process for evaluating and selecting creative work for

No. 23-40564

presentation in some forum.[5] The parties agree that Ibanez completed one juried work, the film *Men of Steel*. However, the record before the district court is devoid of any evidence that Ibanez produced a second juried creative activity. In fact, in Ibanez's own exhibit containing a list of his creative scholarship, the only work labeled as "juried" is *Men of Steel*.

On appeal, Ibanez cites "numerous examples" of works that he contends are juried because they were selected for presentation. But nothing in the record indicates that these works were selected for presentation. Even assuming that all the works were selected, the record does not describe the process by which those selections occurred—i.e., whether the selection process was completely non-competitive and open to all who apply, or instead involved some form of evaluation. On this record, Ibanez has not demonstrated a genuine dispute of material fact as to whether he met TAMUK's baseline requirements for tenure.

Ibanez also asks this court to consider his qualifications using a broader definition of "juried" that is based on his own interpretation of a "Check-List for Promotion/Tenure" published on TAMUK's website (which is not part of the appellate record). In relevant part, the form reminds professors to include "other juried activities/proceedings, such as exhibits, performances or competitions." Ibanez argues that the phrase "such as exhibits, performances or competitions" modifies "juried activities/proceedings," meaning that any exhibit, performance, or competition is a juried activity/proceeding.

---

[5] Consistent with this understanding of "juried," Ibanez explained on appeal that "[i]f an exhibit or performance is juried, the work is evaluated to see if it meets criteria to be exhibited in a particular forum."

11

No. 23-40564

Even assuming the argument was not waived and judicial notice of the TAMUK website is appropriate, Ibanez's proposed interpretation is untenable. A plain reading of the TAMUK checklist shows that the phrase "such as exhibits, performances or competitions" is intended to provide examples of "activities/proceedings" not "juried activities/proceedings." In other words, the checklist provides that professors should include "juried exhibits," "juried performances," and "juried competitions." A reading otherwise would render the word "juried" superfluous. Moreover, interpreting "juried" to include any "exhibit, performance, or competition" would contradict Ibanez's own arguments and evidence, which assume the term indicates some degree of evaluation that is not present in all exhibitions.[6]

In the alternative, Ibanez contends that he presented sufficient evidence that he was qualified for tenure because—regardless of whether he met TAMUK's baseline requirements—"some significant portion of the departmental faculty, referrants or other scholars in the particular field" found him qualified. *See Tanik*, 116 F.3d at 776 (internal quotation omitted). Relying on *Tanik*, which itself adopted the Second Circuit's reasoning in *Zahorik v. Cornell University*, 729 F.2d 85 (2d Cir. 1984), Ibanez argues that the only "opinions that matter" are those of people with "expertise—i.e., department faculty," and that it was error for the district court "to give

---

[6] The University Film Video Association's Policy Statement on the "Evaluation of Creative Activities for Tenure and/or Promotion"—submitted in support of Ibanez's opposition to summary judgment—indicates that not all exhibits are juried by explaining that "exhibitions are *often* juried, and the selectivity of the process should be a consideration in the review process." (emphasis added). Ibanez also appears to concede not all exhibits are juried by arguing that "*[i]f* an exhibit or performance is juried, the work is evaluated to see if it meets criteria to be exhibited in a particular forum." (emphasis added).

No. 23-40564

deferential weight to the opinions of non-department faculty or others that are not scholars in the particular field." Contrary to Ibanez's arguments, however, the recommendations of all tenure decisionmakers, not just departmental faculty, are relevant to an inquiry into whether a professor is qualified for tenure, and we do not read *Zahorik* to say otherwise. *See Zahorik*, 729 F.2d at 90 (reviewing the ultimate tenure recommendations of all decisionmakers in its analysis); *Chu*, 592 F. App'x at 262, 265 (reviewing "every level" of plaintiff's tenure review process).

Applying this principle, Ibanez's evidence is insufficient to raise a genuine dispute of material fact regarding whether he was qualified for tenure despite failing to meet baseline requirements. Ibanez points to the favorable recommendations of the departmental committee, the tenure appeals committee, and his expert witness. However, when compared to all others voting against Ibanez's tenure and promotion—including the department chair, the college committee, the college dean, the provost, and the promotion appeals committee—it is difficult to conclude that a "significant portion of the departmental faculty, referrants or other scholars in the particular field" found him qualified. *See Tanik*, 116 F.3d at 776 (internal quotation omitted); *Chu*, 592 F. App'x at 265. This conclusion is supported by the fact that Ibanez cannot show he meets the minimum requirements for tenure, and Ibanez's expert found him qualified through the use of national and international standards and the TAMUK Handbook, not through the use of TAMUK's published and approved "University Level Minimum Requirements for Tenure and Promotion."

In summary, Ibanez has not presented sufficient evidence to create a genuine dispute of material fact regarding whether he was qualified for tenure. He cites only one example of a juried creative activity, and his attempts to classify his other creative endeavors as juried lack evidentiary support. Further, the favorable opinions of a select number of faculty

No. 23-40564

members and his expert witness—when compared to the number of faculty members who voted against Ibañez's tenure—are insufficient to show that Ibanez was otherwise qualified. As such, Ibanez failed to make a prima facie showing of employment discrimination because he was not qualified for tenure, and the district court did not err in granting summary judgment to TAMUK.

## B.

Even if Ibanez had shown he was qualified for tenure, his prima facie case would still fail because he has not raised a genuine dispute of material fact as to whether he was denied tenure under circumstances permitting an inference of discrimination. On appeal, Ibanez presents numerous reasons the circumstances surrounding his tenure decision suggest discrimination. Assuming Ibanez preserved all arguments, we find they fall short of producing an inference of discrimination.[7]

First, Ibanez presents evidence that many individuals and groups supported his tenure application. But TAMUK's failure to give deference to the opinions of departmental faculty, the tenure appeals committee, the Hispanic Faculty Committee, the student government, and Ibanez's expert

---

[7] While Ibanez correctly notes that he was not required to show a similarly situated professor to prove discrimination, he also argues that the district court discounted evidence that TAMUK allowed deviances from its policy for Euro-American professors. To the extent that Ibanez does intend to argue that there is a similarly situated professor who was treated differently than him, we note the argument also falls short. To establish a prima facie case, "a plaintiff must show that he was treated less favorably than others 'under nearly identical circumstances.'" *Willis v. Cleco Corp.*, 749 F.3d 314, 320 (5th Cir. 2014) (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). The district court adeptly explained that Ibanez failed to show how any other professor, including professors Faherty, Ranson, and Lucas, was "similarly situated" to Ibanez. Ibanez does not explain on appeal how the district court erred in its analysis on this issue, nor does he provide any reasons as to why those professors were similarly situated. Thus, the district court did not err.

No. 23-40564

witness does not, itself, give rise to an inference of discrimination where many other faculty groups—including the department chair, college committee, college dean, provost, and promotion appeals committee—recommended against Ibanez's tenure and promotion. *See Zahorik*, 729 F.2d at 95 ("Universities are free to vest authority in designated officials to override departmental decisions, and the exercise of that authority is not itself evidence of discrimination . . . ."). Moreover, most of the individuals and groups Ibanez highlights have no role in tenure and promotion decisions, or came to their conclusions utilizing inapplicable national and international standards.

Next, Ibanez argues that the department chair, dean, and provost did not follow tenure and promotion policy. Specifically, Ibanez explains that during his review, the department chair commented that "most of the work for [Ibanez's single juried] film had been completed before Ibanez began working at TAMUK." This comment, Ibanez argues, shows a violation of TAMUK's policy that scholarly work credited while employed will count toward tenure. But crucially, as the department chair himself acknowledged, TAMUK did follow policy and fully credited Ibanez for the juried film.

Ibanez also points to TAMUK's failure to take certain steps as evidence of discrimination. For example, he argues that TAMUK failed to fully document its decision to deny him tenure, failed to produce TAMUK's tenure review policy, and failed to act upon the findings of the advisory committee.[8] But it is difficult to see how TAMUK's production of direct,

---

[8] Ibanez also argues that TAMUK failed to compare Ibanez to other qualified peers. But as Ibanez himself states, under TAMUK guidelines, decisionmakers "may," not "must," make comparisons to peers. Moreover, the guidelines state that comparisons are made "in addition to" minimum expectations, not "in lieu of" minimum expectations. In short, TAMUK decisionmakers were not required to compare Ibanez to his peers—

No. 23-40564

sworn testimony by the very people who made Ibanez's tenure decision—as opposed to other types of documentation—produces an inference of discrimination. And TAMUK *did* attach at least some documentary corroboration to the decision-makers' affidavits, such as the university guidelines for tenure and promotion, and lists of college-specific mandatory minimums for tenure and promotion. Lastly, a review of the record shows that TAMUK took appropriate steps to investigate the advisory committee's findings. Pursuant to TAMUK's policy, Ibanez's appeal was submitted to a tenure appeals committee and a promotion appeals committee for full, independent review. The university president then considered all available information—including the reviews of both committees—and came to a decision. Contrary to Ibanez's characterization, nothing suggests that TAMUK disregarded the advisory committee's report.

Finally, Ibanez argues that TAMUK failed to credit Ibanez's work focused on "important historical figures who made significant contributions to racial justice," and that he provided evidence of more general, systemic discrimination at TAMUK. The record does not show that any of Ibanez's work was improperly discounted. Rather, the record shows Ibanez was credited for *Men of Steel*, the only work he labeled as juried. And, as the district court correctly noted, allegations of systemic racism within an institution—without more—are insufficient to carry Ibanez's burden to show individualized discriminatory treatment. *See Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir. 1992) ("[P]roof of pretext, hence of discriminatory *intent*, by statistics *alone* would be a challenging endeavor.").

\*       \*       \*

---

especially after they concluded that Ibanez failed to meet minimum expectations—and their failure to do so does not produce an inference of discrimination.

No. 23-40564

Ibanez appears to have been a capable artist and well-respected professor at TAMUK. Crediting Ibanez's evidence, one may well believe that TAMUK's tenure requirements are too arbitrary or that Ibanez deserved tenure based on his service to the university. But "[e]mployment discrimination laws are not intended to be a vehicle for judicial second-guessing of employment decisions." *See Hackett v. U.P.S.*, 736 F. App'x 444, 451 (5th Cir. 2018) (internal quotation omitted). Courts "are understandably reluctant to review the merits of a tenure decision" because "[d]etermination of the required level [of achievement required for tenure] in a particular case is not a task for which judicial tribunals seem aptly suited." *Zahorik*, 729 F.2d at 93. Thus, the dispositive question is whether Ibanez has presented sufficient evidence that his race or national origin was the reason for the failure to promote. *See Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 264 (5th Cir. 1997). He has not.

In conclusion, Ibanez simply fails to point to any record evidence indicating that race and national origin factored into TAMUK's decision to deny Ibanez tenure and a promotion, and none of Ibanez's arguments to the contrary show otherwise. Because Ibanez failed to create a genuine dispute of fact as to whether he was denied tenure under circumstances giving rise to an inference of discrimination, he failed to make a prima facie case of employment discrimination. Therefore, the district court correctly granted summary judgment to TAMUK.

## IV.

Finding no reversible error in the district court's proceedings, we AFFIRM.